IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Felicia Wanette Campbell, | ) | C/A No.: 1:20-cv-1715-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Mary Geiger Lewis, United States District Judge, dated August 17, 2020, referring this matter for disposition. [ECF No. 10]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 9].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied

the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

## I.    Relevant Background

### A.    Procedural History

On November 1, 2017, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on March 13, 2017. Tr. at 121, 123, 246–53, 254–60. Her applications were denied initially and upon reconsideration. Tr. at 161–64, 165–68, 177–82. On March 26, 2019, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Joshua Vineyard. Tr. at 38–89 (Hr'g Tr.). The ALJ issued an unfavorable decision on May 15, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–37. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 1, 2020. [ECF No. 1].

### B.    Plaintiff's Background and Medical History

#### 1.    Background

Plaintiff was 37 years old at the time of the hearing. Tr. at 50. She completed high school and some college. *Id.* Her past relevant work ("PRW") was as a jewelry salesperson, an administrative assistant, a retail clerk, and

a pastry cook. Tr. at 82. She alleges she has been unable to work since October 1, 2017.[1] Tr. at 48.

### 2.  Medical History

Plaintiff presented to the emergency room ("ER") at Carolina Pines Medical Center ("CPMC"), with complaints of weakness and paresthesia on March 13, 2017. Tr. at 559. She reported feeling numb from the waist down upon waking. *Id.* David C. Winn, M.D. ("Dr. Winn"), recorded normal findings on physical exam. Tr. at 562. A computed tomography ("CT") scan of Plaintiff's lumbar spine showed no evidence of acute osseous abnormality. Tr. at 566. Dr. Winn's clinical impression was bilateral leg paresthesia. Tr. at 565. He discharged Plaintiff with instruction to return if her problem worsened or failed to improve. *Id.*

The following day, Plaintiff presented to the ER at Carolinas Hospital System ("CHS"), complaining of numbness from the waist down that had lasted for three days. Tr. at 539. She remained able to walk. *Id.* Kenneth Scott Burns, Jr., M.D. ("Dr. Burns"), observed no focal neurological deficits, intact cranial nerves, and could find no significant muscle weakness. Tr. at 540. He assessed paresthesia of the lower extremity and discharged Plaintiff

---

[1] Plaintiff originally alleged an onset date of March 13, 2017, to coincide with her first ER visit. Tr. at 246, 254. During the hearing, she moved to amend her alleged onset date to October 1, 2017, as she returned to work following her hospitalization and continued to work close to full-time hours until October 2017. *See* Tr. at 49–50, 64.

to follow up with neurologist Elijah Owens, M.D. ("Dr. Owens"), the following morning. Tr. at 540, 545.

Plaintiff was hospitalized at CHS from March 15 through March 21, 2017, for a multiple sclerosis ("MS") flare. Tr. at 450–51. She reported paresthesia and episodes of shortness of breath that sometimes occurred at rest and had lasted for a couple of months. Tr. at 428. Dr. Owens examined Plaintiff, noting the following: alert and oriented times three; intact recent and remote memory; attention span within normal limits; normal muscle bulk and tone; no tremor; good strength on motor exam; decreased sensation to pinprick over the lower extremities that was more prominent on the right from the T10 region downward; symmetric reflexes; normal coordination on finger-nose-finger testing; and unsteady, somewhat wide-based gait. Tr. at 414–15. He was concerned about a possible lesion on Plaintiff's brain, given the asymmetry she demonstrated on exam. Tr. at 415. He ordered magnetic resonance imaging ("MRI") of the brain and thoracic spine and nerve conduction studies ("NCS"). *Id.* The MRI of Plaintiff's brain showed small T2 hyperintense foci in the left frontal lobe and the periventricular white matter posteriorly that were consistent with MS plaques. Tr. at 452–53. The MRI of Plaintiff's thoracic spine showed a small central bulge at T6–7 with a left paracentral bulge or small protrusion at T7–8 that caused some effacement of the anterior thecal sac and might abut the anterior aspect of the cord. Tr. at

4

454. It indicated no evidence of cord signal change. *Id.* The NCS showed no evidence of large fiber neuropathy. Tr. at 518. A lumbar puncture showed 11 oligoclonal bands with an elevated immunoglobulin G ("IgG") index. Tr. at 450. Dr. Owens diagnosed Plaintiff with presumptive MS. *Id.* He ordered a five-day course of intravenous Solu-Medrol to treat the MS flare, as well as vitamin D replacement for low vitamin D. *Id.* Plaintiff had an episode of tachycardia and was examined by a cardiologist. *Id.* An echocardiogram ("echo") showed impaired relaxation pattern of left ventricular diastolic filling, mild concentric left ventricular hypertrophy, left ventricular ejection fraction of 60–65%, and no aortic regurgitation. Tr. at 419. Telemetry showed sinus tachycardia, and Plaintiff was started on a beta blocker that was later discontinued. Tr. at 419, 450. Plaintiff improved over the course of treatment and was discharged with a prescription for a Medrol Dosepak, a work excuse through April 15, and instruction to follow up with a neurologist within two weeks. Tr. at 450.

Plaintiff followed up with Dr. Owens on April 5, 2017. Tr. at 587. Dr. Owens deferred gait examination and recorded normal findings on exam. Tr. at 587–88. He assessed MS and discussed treatment options with Plaintiff, ultimately deciding to start her on Aubagio. Tr. at 588. He warned Plaintiff of possible hair loss and a risk for birth defects, and Plaintiff agreed to follow up with her gynecologist. *Id.*

Plaintiff presented to the ER at CHS on April 7, 2017, for syncopal episodes and a headache. Tr. at 376. She endorsed weakness, as well as numbness and tingling in both lower extremities. Tr. at 377. Her blood pressure was elevated at 153/74 mmHg. Tr. at 378. A computed tomography ("CT") scan of her brain was unremarkable. Tr. at 393. Chest x-rays showed no acute findings. Tr. at 394. Bradley Stokes Russell, M.D. ("Dr. Russell"), diagnosed syncope and hypertension and discharged Plaintiff with instructions to follow up with Dr. Owens. Tr. at 380.

On June 7, 2017, Plaintiff reported Aubagio had caused hair loss and initial gastrointestinal upset that had later improved. *Id.* She denied other side effects and indicated she felt good about the medication. *Id.* Dr. Owens deferred a gait exam, but noted normal bulk and tone, good strength in all extremities, intact sensation to light touch throughout, symmetric reflexes, and good coordination on finger-nose-finger testing. Tr. at 586. He continued Aubagio and emphasized the need for Plaintiff to use birth control given potential teratogenic effects of the medication. *Id.*

Plaintiff presented to Jennifer M. Lynch, FNP ("NP Lynch"), as a new patient on July 14, 2017. Tr. at 703. She complained of bilateral arm pain, joint pain, muscle spasms, and contractures. *Id.* She endorsed fatigue, weakness, blurred vision, back pain, stiffness, muscle weakness, arthritis, loss of strength, difficulty with concentration, poor balance, headaches,

disturbances in coordination, numbness, anxiety, and mental problems. Tr. at 703–04. NP Lynch noted malaise and mild/pain distress. Tr. at 704. She also observed depressed and anxious affect and joint tenderness, swelling, and decreased musculoskeletal range of motion ("ROM"). *Id.* She prescribed B12 injections, added Baclofen 10 mg for MS-related pain, and started Plaintiff on Metformin HCl 500 mg for diabetes. Tr. at 706. She also prescribed Lisinopril, Drisdol, and Gabapentin. Tr. at 707–09.

Plaintiff reported improved pain and requested that her Gabapentin dose be increased on August 4, 2017. Tr. at 775. She denied taking Lisinopril. *Id.* She endorsed fatigue, weakness, joint pain, back pain, stiffness, muscle weakness, arthritis, numbness, anxiety, and depression. Tr 776. NP Lynch noted joint tenderness, joint swelling, decreased ROM, and depressed and anxious affect on physical exam. Tr. at 777. She prescribed Baclofen 10 mg, increased Gabapentin to 600 mg three times a day, and instructed Plaintiff to continue to take Lisinopril and Metformin. Tr. at 778. She also prescribed a three-pronged cane. Tr. at 791.

Plaintiff presented to NP Lynch for an intravenous iron infusion on August 16, 2017. Tr. at 695. She said she hoped the infusion would help with her fatigue. *Id.* She complained of pain throughout her body with muscle tightness and weakness all over. *Id.* She endorsed fatigue, joint pain, back pain, stiffness, difficulty with concentration, poor balance, headaches,

disturbance in coordination, numbness, anxiety, and depression. Tr. at 695–96. NP Lynch observed Plaintiff to be in mild pain/distress and to demonstrate joint tenderness, swelling, decreased ROM and depressed and anxious affect. Tr. at 696–97. She ordered an intravenous infusion of Ferrlecit and a Solu-Medrol injection. Tr. at 697.

On August 17, 2017, Plaintiff presented to Pee Dee Eye Associates for a diabetic eye exam. Tr. at 551. She described easily-fatigued eyes and frequent eye strain. *Id.* Stephen K. Flowers, O.D. ("Dr. Flowers"), diagnosed dry eye syndrome of the bilateral lacrimal glands, type 2 diabetes without complications, left eye myopia, right eye astigmatism, and long-term use of oral hypoglycemic drugs. Tr. at 553. He noted Plaintiff was at low risk for diabetic retinopathy. *Id.*

Plaintiff complained of an MS exacerbation on September 26, 2017. Tr. at 720. She reported feeling weak and tired with no energy and having leg weakness, decreased coordination, and fatigue. Tr. at 723. She requested NP Lynch place her on light duty at work because she was struggling to keep up. *Id.* She also requested a repeat steroid infusion. *Id.* NP Lynch recorded decreased ROM of Plaintiff's neck, depressed and anxious affect, and joint tenderness, swelling, and decreased ROM. Tr. at 724–25. She ordered a Methylprednisolone Sodium Succinate infusion and recommended Plaintiff increase her fluid intake. Tr. at 725.

8

Plaintiff followed up for intravenous steroid infusion on October 2, 2017. Tr. at 734. She reported feeling weak and as if her legs would not work. *Id.* She endorsed fatigue, difficulty with concentration, disturbances in coordination, depression, joint pain, back pain, stiffness, and muscle weakness. Tr. at 734–35. NP Lynch observed Plaintiff to demonstrate mild pain/distress, depressed and anxious affect, and joint tenderness, swelling, and decreased ROM. Tr. at 735–36. She ordered intravenous infusion of Solu-Medrol and recommended Plaintiff increase her fluid intake. Tr. at 736–37.

Plaintiff presented for intravenous steroid infusion on October 3, 2017. Tr. at 688. She reported being in "a good bit of pain," but considered the steroids to be helping. *Id.* She endorsed fatigue, weakness, joint pain, back pain, stiffness, muscle weakness, arthritis, difficulty with concentration, depression, and anxiety. Tr. at 688–89. NP Lynch described Plaintiff as being in mild pain/distress and having decreased ROM of her neck, joint tenderness, joint swelling, decreased ROM of the joints, and depressed and anxious affect. Tr. at 689–90. She administered intravenous steroids, ordered an MRI of Plaintiff's lumbar spine, and recommended Plaintiff increase her fluid intake and limit her activity. Tr. at 690.

Plaintiff again presented for intravenous infusion therapy on October 4, 2017. Tr. at 747. She reported the steroids were providing some relief, as her weakness was improving. *Id.* NP Lynch noted mild pain/distress, joint

9

tenderness, joint swelling, decreased ROM, and depressed and anxious affect. Tr. at 748–49. She prescribed Synthroid 25 mcg and Levothyroxine Sodium 200 mcg for hypothyroidism and Solu-Medrol infusion for MS. Tr. at 749–50.

Plaintiff returned to NP Lynch for intravenous steroid therapy on October 6, 2017. Tr. at 740. She reported improved mobility. *Id.* NP Lynch observed Plaintiff to appear in mild pain/distress and to demonstrate joint tenderness, joint swelling, decreased ROM, and depressed and anxious affect. Tr. at 742. She noted Plaintiff's random glucose was elevated at 135 mg/dL. *Id.* She refilled Lisinopril and Metformin and ordered intravenous infusion of Solu-Medrol. Tr. at 743.

Plaintiff presented to the ER at CPMC for bilateral leg and knee pain on October 7, 2017. Tr. at 571. She indicated she had just completed a course of steroids for MS and needed medication for pain. *Id.* Robert A. Barefoot, M.D. ("Dr. Barefoot"), observed decreased ROM of Plaintiff's lower extremities and severe tenderness from her knee to her thigh that was more pronounced on the left than the right. Tr. at 574. He assessed neuropathy and prescribed Oxycodone-Acetaminophen 5-325 mg for pain and Promethazine 25 mg for nausea. Tr. at 575.

On October 27, 2017, an MRI of Plaintiff's lumbar spine was normal. Tr. at 577.

On November 13, 2017, Plaintiff presented to Stephen L. Smith, M.D. ("Dr. Smith"), to discuss pain medication. Tr. at 764. Dr. Smith indicated Plaintiff's MRI results did not justify keeping her on Norco. *Id.*

Plaintiff followed up with NP Lynch to discuss her MRI results on October 30, 2017. Tr. at 768. She described pain that radiated into her legs, fatigue, weakness, joint pain, back pain, muscle weakness, arthritis, loss of strength, poor balance, disturbances in coordination, anxiety, and depression. Tr. at 768–69. NP Lynch noted mild pain/distress, joint tenderness, joint swelling, decreased musculoskeletal ROM, and depressed and anxious affect. Tr. at 769–70. Plaintiff's random glucose was elevated at 144 mg/dL. Tr. at 770. NP Lynch indicated Plaintiff's diabetes had improved. Tr. at 771. She prescribed Soma 350 mg for muscle spasms, referred Plaintiff for physical therapy, and advised her to limit her activity for comfort. Tr. at 772. She also assessed a urinary tract infection and prescribed Flagyl. *Id.*

Plaintiff reported worsening spasms, particularly over her legs, on November 14, 2017. Tr. at 583. She denied relief from a recent course of intravenous steroids. *Id.* Dr. Owens recorded normal findings on physical exam. *Id.* He increased Gabapentin to 800 mg three times a day to address Plaintiff's increased symptoms. *Id.* He requested Plaintiff call his office with information as to the dosage of Baclofen her primary care provider had prescribed and noted he would likely increase the dose. *Id.*

Plaintiff continued to endorse nonspecific paresthesia on January 17, 2018. Tr. at 619. She indicated she continued to take Aubagio for MS and was also taking Baclofen for spasms and Gabapentin for paresthesia. *Id.* Dr. Owens recorded normal findings on exam, but deferred gait examination. *Id.* He continued Plaintiff on Aubagio and Gabapentin and increased Baclofen to three times a day. *Id.*

On February 15, 2018, state agency medical consultant Thomas Bixler, M.D. ("Dr. Bixler"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; and sit for a total of about six hours in an eight-hour workday. Tr. at 106–08, 116–18.

Plaintiff followed up with Dr. Flowers for a glaucoma evaluation and intraocular pressure check on February 19, 2018. Tr. at 937–39. Dr. Flowers noted normal findings on exam. Tr. at 938.

Plaintiff reported stable MS symptoms on February 28, 2018. Tr. at 616. She described numbness that was most prominent over her hands and some grip strength weakness. *Id.* Dr. Owens deferred gait examination and recorded normal findings on physical exam. Tr. at 617. He ordered new MRI scans of Plaintiff's brain and spine and NCS. *Id.*

Plaintiff presented to CPMC for an initial physical therapy evaluation for treatment of the thoracic and lumbar spine on March 21, 2018. Tr. at 643. She complained of numbness, pain, decreased strength, and difficulty walking, performing activities of daily living ("ADLs"), and engaging in home skills. Tr. at 644. She indicated she had sustained one fall over the prior three months due to her legs giving out. *Id.* Physical therapist Andrea S. Bailey ("PT Bailey"), observed the following: increased lumbar lordosis; anterior pelvic tilt; intact bilateral coordination; impaired sensation; intact problem solving and ability to follow directions; 3/5 left hip flexors; 5/5 left hip abductors, medial rotators, and lateral rotators; 4+/5 left hip extension and adduction; 4+/5  left knee flexion; 4-/5 left knee extension; 5/5 left ankle dorsiflexion and plantar flexion; 5/5 right hip abductors, medial rotators, and lateral rotators; 3+/5 right hip flexion; 4+/5 right hip extension and adduction; 4+/5 right knee flexion; 4-/5 right knee extension; 5/5 right ankle dorsiflexion and plantar flexion; lumbar flexion within functional limits; lumbar extension to five degrees; lumbar side bending to 12 degrees on the right and 20 degrees on the left; right lumbar rotation to 50%; left lumbar rotation to 25%; pain with palpation at L4, L5, and S1 with increased mobility; and increased muscle tension to the lumbar and thoracic paraspinals. Tr. at 645–46. She indicated Plaintiff had fair rehabilitation potential and planned for her to attend sessions twice a week for six weeks.

Tr. at 646. Plaintiff followed up on March 30, 2018. Tr. at 649–52. She demonstrated "fair tolerance" and was motivated, but reported significant fatigue with exercise. Tr. at 652. She attended additional sessions on April 4, 9, 11, 17, 18, and 26 and May 1, 2, 7, and 8, but failed to improve with lower extremity strengthening, core strength, and ROM. Tr. at 661–79, 909–31.

On April 4, 2018, Plaintiff underwent NCS that showed mild bilateral carpal tunnel syndrome ("CTS"). Tr. at 621–25. An MRI of Plaintiff's thoracic spine showed stable focal posterior bulges or small protrusions at T6–7 and T7–8, no focal lesions along the course of the thoracic cord, and a subcutaneous lesion posteriorly at about the T9–10 level that likely represented a sebaceous cyst. Tr. at 626. An MRI of her cervical spine showed degenerative changes at C4–5 and C5–6, a prominent central bulge or small protrusion at C4–5 with associated annular fissure, no obvious focal herniation or impingement, and normal signal throughout the cord with no focal lesions or abnormal enhancement postcontrast. Tr. at 627. An MRI of Plaintiff's brain was stable, showing small hyperintense foci in the white matter in the left frontal lobe and left parietal lobe with no new lesions. Tr. at 628.

On April 23, 2018, Dr. Owens noted Plaintiff's most recent MRI scans showed stable white matter lesions in the brain and an unchanged lesion in the thoracic spine. Tr. at 613–14. He stated NCS showed mild carpal tunnel

syndrome ("CTS"). Tr. at 614. He deferred gait examination and noted normal bulk and tone, good strength in all extremities, intact sensation to light touch throughout, symmetric reflexes, and good coordination. Tr. at 614. He continued Plaintiff on Aubagio for MS and prescribed wrist splints for CTS. Tr. at 614, 792.

Plaintiff presented to NP Lynch for a three-month recheck on May 1, 2018. Tr. at 752. She reported "doing great," and NP Lynch described her as "smiling and feeling good about herself." Tr. at 755. She noted some areas of concern on the bottoms of her feet and requested NP Lynch examine them. *Id.* She endorsed fatigue, weakness, sleep disorder, nasal congestion, joint pain, back pain, stiffness, muscle weakness, arthritis, loss of strength, anxiety, and depression. Tr. at 755–56. NP Lynch noted mild pain/distress, joint tenderness, joint swelling, decreased musculoskeletal ROM, and depressed and anxious affect. Tr. at 756–57. She assessed bilateral plantar warts and referred Plaintiff to Misty Lee, DPM ("Dr. Lee"). Tr. at 758. She prescribed Cipro for a urinary tract infection, noted Plaintiff's diabetes was improved, and continued her current treatments for diabetes and MS. Tr. at 758–60.

On May 23, 2018, Plaintiff presented to podiatrist Walter Singleton, DPM ("Dr. Singleton"), with a complaint of painful lesions on her feet. Tr. at 870. Dr. Singleton noted palpable pulses, no edema, tender lesions on the

bilateral feet, dry skin, and antalgic gait. *Id.* He stated the lesions were non-punctuate and demonstrated no drainage upon their excision. *Id.* He assessed benign neoplasms on the bilateral feet, diabetes, and xerosis. *Id.* He prescribed Urea 40% cream. *Id.*

Whitney Cranford prepared a progress report dated June 5, 2018. Tr. a 788. She noted Plaintiff was active in services at Rubicon Family Counseling Services. *Id.* She indicated she was not allowed to send therapy notes, but provided a summary of the services Plaintiff had received. *Id.* She explained that Plaintiff had presented for an initial assessment on January 25, 2018, to address issues with her child's father through family therapy. *Id.* She denied depression and reported having been diagnosed with diabetes and MS. *Id.* Ms. Cranford noted Plaintiff had been sporadic in her attendance, attending sessions on February 19 and April 9, but failing to attend on February 28 and cancelling an appointment on May 16. *Id.* She noted Plaintiff was gaining insight into solutions to problems and was making fair progress. *Id.*

On June 15, 2018, state agency medical consultant R. Cohen, M.D. ("Dr. Cohen"), reviewed the record and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally balance and climb ladders/ropes/scaffolds; avoid all exposure to

extreme heat; avoid even moderate exposure to hazards; and avoid concentrated exposure to vibration. Tr. at 138–40, 153–55.

On June 20, 2018, Plaintiff informed Dr. Singleton she had been unable to obtain the cream he prescribed for her feet because of cost and insurance issues. Tr. at 871. Dr. Singleton noted tissue biopsies were negative. *Id.* He observed antalgic gait, fissured skin on the plantar surface of the right foot, and a painful lesion on the right foot. *Id.* He excised the lesion and prescribed Urea 20% cream. *Id.*

Plaintiff presented to Pee Dee Mental Health for an initial clinical assessment on July 10, 2018. Tr. at 960–67. She reported feeling depressed, not enjoying life, being less active, not wanting to leave her home, being uncomfortable around others, and constantly cleaning. Tr. at 960. Debra A. McFarland ("Ms. McFarland"), documented the following on a mental status exam: normal appearance and hygiene; normal motor activity; cooperative attitude; calm behavior; normal eye contact; appropriate affect; depressed mood; normal rate and tone of speech; logical/goal-directed thought process; intact recent and remote memory; intact attention and immediate recall; easily distracted concentration and calculations; average fund of knowledge; adequate sleep, appetite, and libido; fatigued energy level; poor insight; and fair judgment. Tr. at 965–66. Plaintiff denied delusions, obsession, hallucinations, and homicidal ideation and endorsed suicidal ideation without

plan. Tr. at 965. Ms. McFarland assessed generalized anxiety disorder ("GAD"). Tr. at 966. She indicated Plaintiff would benefit from individual counseling and psychiatric evaluation for possible medications. *Id.*

Plaintiff presented to Black Creek Medical Consultants' Ear, Nose, and Throat Division on June 16, 2018. Tr. at 1067. She complained of thyroid problems and stated the left side of her neck felt stiff and slightly swollen. *Id.* She also endorsed hearing loss, fluctuating weight, and chronic fatigue. *Id.* Orville Dyce, M.D. ("Dr. Dyce"), observed Plaintiff to be obese and confused, to have moderate nasal obstruction, and to demonstrate a protuberant abdomen. Tr. at 1068–69. He assessed hypothyroidism, iron-deficiency anemia, oral cavity ulcer, and chronic fatigue and referred Plaintiff for lab studies. Tr. at 1069. Plaintiff's thyroid stimulating hormone ("TSH") level was low. Tr. at 1072.

On September 5, 2018, Plaintiff complained of painful lesions on both feet and inability to obtain Urea 20% cream because of its cost. Tr. at 872. Dr. Singleton observed palpable pulses, no bilateral edema, painful lesions on both feet, and dry skin. *Id.* He excised the lesions without drainage and prescribed Lac Hydrin lotion. *Id.*

Plaintiff also followed up with Dr. Owens on September 5, 2018. Tr. at 954–56. She reported her symptoms had generally been stable, aside from an episode of decreased vision in the right eye six weeks prior. Tr. at 955. She

denied side effects from Aubagio. *Id.* Dr. Owens deferred gait examination and noted normal findings on exam. Tr. at 956. He advised Plaintiff to call his office or visit the ER if she experienced further visual episodes, as they could represent optic neuritis and require steroids. *Id.*

Plaintiff complained of blurred distance vision on September 25, 2018. Tr. at 933. She reported eye soreness and heaviness. *Id.* Dr. Flowers diagnosed left eye myopia, right eye astigmatism, bilateral dry eye syndrome, type 2 diabetes without complications, and long-term use of oral hypoglycemic drugs. Tr. at 935. He prescribed artificial tears and emphasized the importance of Plaintiff following up with her primary care provider for hypertension and regularly monitoring the retinas and optic nerves. *Id.*

Plaintiff participated in a telehealth visit with Ilva Iriarte, M.D. ("Dr. Iriarte"), for an initial psychiatric medical assessment on October 24, 2018. Tr. at 968–69. Dr. Iriarte noted that Plaintiff's counselor reported she had "perseverated on disability and relationship issues" and "could benefit from medications for depression and 'a whole lot of anxiety.'" Tr. at 968. Plaintiff reported no pleasure, always feeling sad, low energy, feeling as if her brain were foggy, poor memory, obsessive cleaning, some catastrophizing, restlessness, and worrying about everything. *Id.* Dr. Iriarte assessed GAD with some depressive symptoms and indicated Plaintiff did not meet diagnostic criteria for obsessive compulsive disorder ("OCD"). *Id.* She

observed normal findings on mental status exam, aside from depressed mood, labile affect, and fair insight and judgment. Tr. at 969. She prescribed Paxil 20 mg and Trazodone 50 mg. *Id.*

Plaintiff returned to NP Lynch for a routine checkup and reported cough and congestion on October 31, 2018. Tr. at 1028. NP Lynch noted mild pain/distress, full bilateral tympanic membranes, purulent nasal discharge, rhonchi, joint tenderness, joint swelling, decreased musculoskeletal ROM, hardened areas on the soles of the bilateral feet, and depressed and anxious affect. Tr. at 1029. She diagnosed an upper respiratory infection and iron-deficiency anemia and noted Plaintiff's diabetes had improved. Tr. at 1031–32. She added prescriptions for Trazodone, Paxil, Baclofen 20 mg, and Drisdol 50,000 units. Tr. at 1032.

Plaintiff presented for an intravenous iron infusion on November 7, 2018. Tr. at 1020. She indicated she was experiencing an MS flare. *Id.* She described bowel and bladder incontinence, weakness, fatigue, and difficulty walking. *Id.* NP Lynch ordered an intravenous iron infusion. Tr. at 1022–23.

On November 14, 2018, Dr. Singleton noted Plaintiff's dorsalis pedis pulse was palpable, but her posterior tibial pulse was only barely palpable. Tr. at 873. He observed no edema, macerations, or ulcerations, but found dry and fissured skin and four painful lesions on Plaintiff's bilateral feet. *Id.* He stated Plaintiff's toenails were long and painful to touch and she had no hair

growth on her lower extremities or toes. *Id.* He excised the lesions, debrided Plaintiff's toenails, and recommended she use Urea daily. *Id.*

Plaintiff also presented for her second week of intravenous iron infusions on November 14, 2018. Tr. at 1012. She said she had improved somewhat, but continued to feel weak. *Id.* She complained of new onset of lesions all over her body. *Id.* NP Lynch ordered iron infusion and referred Plaintiff for skin biopsies. Tr. at 1014–15.

Plaintiff presented for additional iron infusion on November 21, 2018. Tr. at 1005. She reported having felt somewhat better after the first round of iron infusions, but NP Lynch indicated her numbers had not improved. *Id.* NP Lynch indicated they were going to use brand name iron, which she hoped would be more effective. *Id.*

On December 3, 2018, Plaintiff complained that the rain and change in weather had caused her MS to flare. Tr. at 998. NP Lynch planned to proceed with a five-day course of intravenous steroid infusions. Tr. at 1000. She ordered intravenous Solu-Medrol. Tr. at 1001.

Plaintiff followed up with NP Lynch for a second dose of intravenous steroids on December 4, 2018. Tr. at 990–95. She indicated she had improved somewhat, but remained unable to see and walk to avoid falling. Tr. at 992. NP Lynch ordered a Solu-Medrol infusion. Tr. at 994–95.

On December 5, 2018, Plaintiff reported worsened symptoms and sought to discuss home health with Dr. Owens. Tr. at 951. She described diffuse body pain and spasm and indicated she had been diagnosed with depression, anxiety, and OCD. Tr. at 953. She stated she was only taking Gabapentin twice a day. *Id.* Dr. Owens deferred gait examination and noted normal muscle bulk and tone, good strength in all extremities, intact sensation to light touch throughout, symmetric reflexes, and good coordination on finger-nose-finger testing. *Id.* He instructed Plaintiff to increase Gabapentin to 800 mg three times a day and ordered a home health nurse to help her with some of her ADLs. *Id.*

Plaintiff also followed up with Dr. Iriarte on December 5, 2018. Tr. at 970–71. She reported feeling more calm and less anxious since starting Paxil. Tr. at 970. She indicated she had developed a headache since starting the medication, but considered its benefit to outweigh its side effects. *Id.* Dr. Iriarte observed fair insight and judgment and otherwise normal findings on mental status exam. *Id.* She instructed Plaintiff to titrate her Paxil dose up to 30 mg. *Id.*

Additionally, Plaintiff presented to NP Lynch on December 5, 2018. Tr. at 984–89. She indicated she was feeling much better and indicated she needed only one more dose of intravenous steroids. Tr. at 986. NP Lynch noted mild pain/distress, joint tenderness, joint swelling, decreased

musculoskeletal ROM, weakness, hardened areas on the soles of Plaintiff's feet, and depressed and anxious affect. Tr. at 987–88. She ordered a third dose of intravenous steroids. Tr. at 988.

On December 14, 2018, Plaintiff presented to NP Lynch for intravenous iron infusion. Tr. at 979. NP Lynch noted mild pain/distress, joint tenderness, joint swelling, decreased ROM, hardened areas on the soles of the bilateral feet, and depressed and anxious affect. Tr. at 980–81. She ordered an intravenous Ferrlecit infusion for anemia. Tr. at 981.

Plaintiff's iron saturation, hemoglobin, and vitamin D levels were low on testing on February 7, 2019. Tr. at 1073–75.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on March 26, 2019, Plaintiff testified she lived with her children, who were 8 and 17 years old. Tr. at 49–50. She stated she last worked full-time in October 2017 and continued to work part-time for BI-LO until February 17, 2019. Tr. at 50. She described her job duties in the bakery department at BI-LO as baking bread, pies, cookies, and pastries; pulling pre-packaged items from freezers to be placed on the sales floor; and stocking areas on the sales floor. Tr. at 50–51. She said she lifted between five and 20 pounds and stood and walked throughout her shift. Tr. at 51. She stated she

left her job in February because she was experiencing increased problems and symptoms and was no longer able to meet the standing requirements of her job. Tr. at 51–52.

Plaintiff noted that prior to working at BI-LO, she had worked at Belk, starting on a part-time basis prior to being promoted to a full-time position as a department manager. Tr. at 52–53. She indicated she worked for Belk for less than a year, leaving the job within a month of being promoted. Tr. at 53, 55. She stated the job required she stand throughout her shift and lift negligible weight. Tr. at 54–55.

Plaintiff testified she worked as a part-time front desk clerk for eight years for All Star Hospitality. Tr. at 56. She said she checked in guests, made reservations, answered the switchboard, and brewed coffee. Tr. at 57. She indicated she spent most of her shift standing and walking and lifted only negligible weight. Tr. at 58.

Plaintiff testified she had previously worked for Sunoco as an administrative assistant in computer services. Tr. at 58–59. She described typing information required to build employees' computers, passing the paperwork off to the lab, sending emails, formatting documents, filing, making phone calls, and performing other office duties. Tr. at 59. She estimated she lifted less than five founds and said she did very little walking and stood for less than two hours per day. Tr. at 60.

Plaintiff testified she was using a cane daily. Tr. at 52. She said her back pain was a "huge issue" and her legs were weak and went numb. *Id.* She described numbness in her legs, arms, and hands. Tr. at 63. She said she had nerve damage from MS. *Id.* She explained that she was initially diagnosed with MS in March 2017, at which time she was experiencing a significant exacerbation of symptoms. *Id.* She indicated her condition improved such that she returned to work in late-April 2017. *Id.* She noted that, after returning to work, she continued to feel weak and was unable to do things as she had prior to her diagnosis. Tr. at 64. She said she experienced vibration and "buzzing" in her legs. *Id.* She stated she requested that BI-LO reduce her hours, which they did for two weeks prior to returning her to full-time hours from May to mid-October 2017. *Id.* She said BI-LO finally reduced her hours to 20 per week in mid-October 2017 based on her doctor's request. *Id.* Plaintiff explained that going in and out of the freezer worsened muscle spasms in her legs, that she sometimes could not lift because of numbness and pain in her wrists and back, and that she had to stop using a bread machine because of its vibration. *Id.* She described numbness throughout her arm and to her fingertips that prevented her from using a bread slicer. Tr. at 64–65. She indicated her legs were often swollen at the end of her shifts. Tr. at 65. She said a couple of coworkers assisted her while she was working part-time at BI-LO. *Id.*

Plaintiff testified she experienced blurred vision and visual distortions. *Id.* She described difficulty lifting her arms and weakness in her legs. Tr. at 65–66. She said she felt tired for no apparent reason. Tr. at 66. She stated she also had diabetes that caused her feet to be "in bad shape." *Id.* She indicated she developed hard calluses that her foot doctor had to cut every time she visited him. *Id.* She said she took pills for diabetes and denied having been instructed to monitor her blood sugar. *Id.* She noted she had a thyroid problem and that her doctor often adjusted her medication dosage. *Id.* She said she had lower back pain that felt like a cement block and caused pressure on her back. Tr. at 67.

Plaintiff testified she woke at 6:30 each morning to prepare her daughters for school. *Id.* She said her youngest daughter dressed herself, but required help with her hair. *Id.* She indicated she could place her daughter's hair in a ponytail on some days, but required help from her other daughter if her hands were numb. *Id.* She said her sister drove her daughters to school. *Id.* She stated she would eat a light breakfast, take her morning medication, sit in a recliner, and watch the news until she felt sleepy. *Id.* She explained that she would then lie down and nap for about an hour. *Id.* She said she usually napped for an hour or more, two to three times throughout the course of the day. Tr. at 68. She noted she typically alternated between her bed and the chair. *Id.* She said she would cook food in the microwave or her older

daughter would cook or pick up food for them. *Id.* She described spending most days sitting in her chair and watching television, as she was homebound and only went out when she had appointments. *Id.* She said her younger daughter did not require much help with schoolwork, except that she would look over her homework to make sure her answers were correct. *Id.* She admitted she still had a driver's license, but said she only drove to appointments two to three miles from her house because numbness and weakness in her legs and feet made it unsafe for her to drive unnecessarily. Tr. at 68–69. She indicated she had driven herself to work prior to leaving her job in February. Tr. at 69. She estimated her job was four miles from her home. Tr. at 79. She reported a friend drove her to the hearing. *Id.*

Plaintiff said the heaviest item she lifted was a gallon of milk. Tr. at 69. She denied being able to lift any heavier item. *Id.* She described radiating pain in her arms and wrists. *Id.* She said she was completely unable to lift when her arms felt numb. *Id.* She indicated the heat made her feel more fatigued and the cold made her develop more intense muscle spasms. Tr. at 70. She said she developed numbness in her legs when sitting on hard surfaces and could no longer use vibrating items like an electric toothbrush and a hairdryer. *Id.* She noted her vision blurred more as she felt more tired and stressed. *Id.*

Plaintiff testified she suffered from depression and anxiety and had sought treatment from a counselor and a psychiatrist. Tr. at 71. She stated her psychiatrist had prescribed medication. *Id.* She indicated her counselor was helping her to cope with her diagnosis. *Id.* She said she often felt sad and guilty because she required her daughters' assistance and could not participate in many activities with them. *Id.* She explained that she could not drive or ride for long distances and could not be exposed to loud sounds. Tr. at 72.

Plaintiff estimated she could walk 250 feet. *Id.* She said she typically sat in her recliner with her feet up because elevating her feet helped with her leg pain and spasms. *Id.* She stated she experienced headaches each morning after taking Paxil that were relieved by taking a nap. *Id.* She said she experienced shortness of breath and sometimes had dizzy spells while showering. Tr. at 73. She indicated she typically did not require assistance to dress, but sometimes needed help putting on shoes and tying her shoelaces. Tr. at 73–74. She noted her mother often helped by preparing meals and cleaning. Tr. at 74. She admitted she washed clothes and her daughters performed most other household chores. *Id.* She said the numbness in her hands and fingers prevented her from typing on a computer, but she could use her phone to text until her fingers became numb. Tr. at 74–75. She said she had difficulty holding a phone to her ear for even five minutes because of

numbness in her hands. *Id.* She indicated her older daughter had done the grocery shopping for at least a year. Tr. at 79–80. She indicated that prior to that, she would pick up a few items at the end of a shift and would take her daughters to the store with her for more lengthy shopping trips. Tr. at 80–81.

Plaintiff testified she experienced MS flares that typically lasted between two and four weeks. Tr. at 75. She noted she did not feel normal even when not experiencing flares. *Id.* She denied having good days. *Id.*

Plaintiff testified she was no longer able to attend church because she could not sit through the services. *Id.* She said she could not go to movies, take beach vacations, or take her daughter to the park as she had in the past. *Id.* She denied using a cane in her house, noting she could hang on to countertops and furniture, but said she had used one daily since February in other places. Tr. at 76.

Plaintiff testified she had been taking Aubagio for MS since April 2017 and was taking the maximum dose. Tr. at 77. She said she took Gabapentin, Baclofen for muscle spasms, Lisinopril for hypertension, and Metformin for diabetes. Tr. at 77–78. She noted she used a walker that had previously belonged to her father during flare ups and when she could not feel her feet. Tr. at 78. She said she lived in a mobile home that had three steps at the entry and used the handrail to climb the steps. Tr. at 78–79. She denied

having pets and indicated her landlord was responsible for the yard maintenance. *Id.*

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Tracey Wilkerson reviewed the record and testified at the hearing. Tr. at 81–87. The VE categorized Plaintiff's PRW as a jewelry salesperson, *Dictionary of Occupational Titles* ("*DOT*") number 279.357-058, as requiring light exertion with a specific vocational preparation ("SVP") of 5; an administrative assistant, *DOT* number 169.167-010, as requiring sedentary exertion with an SVP of 7; a retail clerk, *DOT* number 238.367-038, as requiring light exertion with an SVP of 4; and a pastry cook, *DOT* number 313.381-026, as requiring medium exertion with an SVP of 7. Tr. at 82. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift, carry, push, and pull up to 20 pounds occasionally and up to 10 pounds frequently; stand and/or walk for a total of four hours throughout an eight-hour workday; sit for up to six hours throughout an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; frequently handle, finger, and feel with the bilateral upper extremities; frequently operate hand and foot controls with the bilateral upper and lower extremities; occasionally be exposed to extreme heat, extreme cold, wetness, and vibration; avoid all exposure to hazards, such as unprotected heights and moving machinery; and

would be absent from work one day each month on an unscheduled basis. Tr. at 82–83. The VE testified that the hypothetical individual could perform Plaintiff's PRW as an administrative assistant as generally performed. Tr. at 83. The ALJ asked whether there were any other jobs in the national economy that the hypothetical person could perform. Tr. at 84. The VE identified sedentary jobs with an SVP of two as an addresser, *DOT* number 209.587-010, a document preparer, *DOT* number 249.587-018, and a call-out operator, *DOT* number 237.367-014, with 5,500, 31,000, and 14,000 positions in the national economy, respectively. *Id.*

The ALJ next asked the VE to consider an individual limited to work at the sedentary exertional level, who could lift and carry up to 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk for a total of two hours throughout an eight-hour workday; sit for up to six hours during an eight-hour workday; and was otherwise limited as described in the first question. *Id.* He asked if the individual could perform Plaintiff's PRW. *Id.* The VE indicated her response was the same as to the first hypothetical question because the restriction to standing and walking for four hours had effectively reduced the individual to sedentary work. Tr. at 84–85.

As a third hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited as described in the second question, except that she must be permitted to use a hand-held

assistive device, such as a single-tipped cane or a three-pronged cane, as needed when standing and walking and would remain able to lift, carry, push, and pull up to the sedentary exertional limits with the contralateral upper extremity. Tr. at 85. He asked if the individual could perform Plaintiff's PRW. Tr. at 85–86. The VE testified the individual could perform Plaintiff's PRW as an administrative assistant, as well as the jobs previously identified in response to the first hypothetical question. Tr. at 86.

As a fourth hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile as described in the third question and to further consider that the individual would be off-task for 15% of the workday, exclusive of regularly-scheduled breaks. *Id.* He asked if the individual would be able to perform Plaintiff's PRW. *Id.* The VE stated the additional restriction would preclude all employment. *Id.* She stated her testimony was consistent with the *DOT* and that she relied on her knowledge and experience as to use of a cane, absences, time off-task, and other factors the *DOT* did not address. Tr. at 87.

Plaintiff's attorney asked the VE to consider the restrictions in the first question, but to further assume the individual would be limited to less than occasional handling, fingering, and feeling. *Id.* She asked how the change would affect the VE's opinion. *Id.* The VE stated there would be no jobs. *Id.*

Plaintiff's attorney asked the VE to consider that the individual would miss three days of work per month. *Id.* The VE testified that would preclude all employment. *Id.*

### 2.     The ALJ's Findings

In his decision dated May 15, 2019, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.
2.  The claimant has not engaged in substantial gainful activity since October 1, 2017, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.  The claimant has the following severe impairments: multiple sclerosis (MS); degenerative disc disease of the cervical and thoracic spine; diabetes mellitus with foot lesions, and carpal tunnel syndrome (20 CFR 404.1520(c) and 416.920(c)).
4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except that she must be permitted to utilize a hand-held assistive device such as a three-pronged cane as needed while standing and walking, with the contralateral upper extremity able to lift, carry, push, and pull up to the sedentary exertional limits. She can never climb ladders, ropes, and scaffolds and can only occasionally balance, stoop, kneel, crouch, and crawl. She can frequently engage in handling, fingering and feeling with her bilateral upper extremities, and can frequently operate bilateral hand and foot controls. She can tolerate occasional exposure to extreme heat, extreme cold, wetness, and vibration, and must avoid all exposure to hazards such as unprotected heights and moving machinery. She will be absent from work 1 day each month on an unscheduled basis.

6.   The claimant is capable of performing past relevant work as an Administrative Assistant (DOT # 169.167-010 (SVP 7)). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.   The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2017, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. at 17–31.

II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)   the ALJ did not properly consider the medical opinion evidence; and

2)   the ALJ did not explain his RFC assessment in accordance with SSR 96-8p.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.   Legal Framework

1.   The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

34

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of

gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to

---

the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390,

401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

     B.    Analysis

     1.    NP Lynch's Opinions

NP Lynch completed a medical release/physician's statement for the South Carolina Department of Social Services, addressing Plaintiff's impairments on December 5, 2018. Tr. at 793–94. She noted Plaintiff was unable to work or participate in activities to prepare for work and her disability was permanent. Tr. at 793. She stated Plaintiff could do the following for a maximum of two hours per workday: sit; stand; walk; climb stairs/ladders; kneel/squat; bend/stoop; push/pull; keyboard; and lift/carry. *Id.* She indicated Plaintiff could not lift/carry objects weighing more than five pounds for more than one hour per day. *Id.* She identified Plaintiff's primary disabling diagnosis as MS and her secondary disabling diagnosis as lumbar radiculopathy. Tr. at 794.

On February 9, 2019, NP Lynch completed an MS medical source statement. Tr. at 1056–59. She indicated she had treated Plaintiff monthly since July 14, 2017. Tr. at 1056. She explained that Plaintiff was diagnosed with MS during a hospital stay in April 2017 and through MRI and CT scans. *Id.* She described Plaintiff's prognosis as fair. *Id.* She identified Plaintiff's symptoms and signs as chronic fatigue, balance problems, paresthesia, weakness, increased deep reflexes, blurred vision, bowel problems, depression, difficulty remembering, sensitivity to heat, unstable walking, pain, muscle spasticity, muscle fatigue of limb, cerebellar ataxia, vertigo, nystagmus, bladder problems, emotional lability, confusion, poor coordination, numbness, dimness of vision, problems with judgment, personality change, and difficulty solving problems. *Id.* She indicated Plaintiff's symptoms had lasted or were expected to last at least 12 months. *Id.* She stated Plaintiff had significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station. *Id.* She explained that during MS exacerbations, Plaintiff was unable to use fine and gross motor skills. *Id.* She indicated Plaintiff had significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the MS

process. Tr. at 1057. She noted Plaintiff had experienced MS exacerbations on September 26, 2017 and May 1, 2018. *Id.* She confirmed that Plaintiff's fatigue was best described as lassitude rather than fatigue of motor function, which was most typical of MS patients. *Id.* She estimated Plaintiff could walk zero city blocks without rest or severe pain; sit for one hour at a time before needing to get up; stand for 30 minutes at a time before needing to sit down or walk around; sit for about two hours during an eight-hour working day; and stand/walk for less than two hours during an eight-hour working day. *Id.* She noted Plaintiff would require a job that would permit shifting positions at will from sitting, standing, or walking and would sometimes need to take unscheduled breaks during the working day. *Id.* She indicated Plaintiff would require a 30-minute break every two hours due to muscle weakness, chronic fatigue, pain/paresthesia, numbness, and adverse effects of medication. Tr. at 1057–58. She noted Plaintiff's legs should be elevated 30 degrees with prolonged sitting over 50% of an eight-hour working day to address swelling. Tr. at 1058. She indicated Plaintiff must use a cane or other assistive device while engaging in occasional standing/walking to address muscle weakness, incoordination, spasticity, and imbalance. *Id.* She estimated Plaintiff could rarely lift and carry 10 pounds or less and could never lift 20 or more pounds. *Id.* She stated Plaintiff could rarely twist and could never stoop (bend) or crouch/squat. *Id.* She indicated Plaintiff's ability to use her upper extremities

was limited by muscle weakness, tremor, incoordination, and fatigue. *Id.* She estimated Plaintiff could use her bilateral upper extremities for the following percentages of time over the course of an eight-hour workday: grasp, turn, and twist objects for 25%; fine manipulation for 5%; reaching in front of the body for 30%; and reaching overhead for 5%. *Id.* She felt that Plaintiff was likely to be off-task during 15% of a typical workday. Tr. at 1059. She confirmed that emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations. *Id.* She stated Plaintiff was capable of low stress work. *Id.* She indicated Plaintiff had good and bad days. *Id.* She estimated Plaintiff would be absent from work about three days per month because of her impairments or treatment. *Id.* She indicated Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. *Id.* She stated Plaintiff was further limited by blurred vision and should avoid temperature changes. *Id.* She indicated her description applied in April 2017 at the earliest. *Id.*

Plaintiff argues the ALJ failed to properly consider NP Lynch's opinions. [ECF No. 15 at 20–24]. She maintains the ALJ did not specify the weight he accorded to the opinions. *Id.* at 21–22. She contends the ALJ did not explain how NP Lynch's opinions were inconsistent with the medical evidence, her part-time work history, and the frequency of her flare ups. *Id.* at 22–24. She claims the ALJ failed to consider the consistency between NP

Lynch's opinions and Dr. Owens's impression that she required home health care. *Id.* at 24.

The Commissioner argues the ALJ appropriately considered the persuasiveness of Dr. Lynch's opinions in accordance with the regulatory framework set forth in 20 C.F.R. § 404.1520c and § 416.920c. [ECF No. 16 at 13, 15, 17]. He maintains the ALJ addressed the supportability factor in noting Dr. Lynch's opinions were conclusory, inaccurate, and not supported by a detailed explanation. *Id.* at 15. He contends the ALJ cited relevant evidence to support his conclusion that Dr. Lynch's opinions were not consistent with the medical evidence and Plaintiff's work history. *Id.* at 15–17. He claims the ALJ did not err in failing to consider consistency between Dr. Lynch's opinion that Plaintiff was not able to work at a regular job on a sustained basis and Dr. Owen's referral for a home health nurse, as such evidence is not valuable or persuasive to the disability determination under 20 C.F.R. § 404.1520b and § 416.920b. *Id.* at 18–19.

Because Plaintiff's claim for benefits was filed after March 27, 2017, the regulations required it be evaluated under the rules in 20 C.F.R. § 404.1520c and § 416.920c.[4] Under these rules, the ALJ is not to defer to or

---

[4] The rules in 20 C.F.R. § 404.1527 and § 416.927 apply to the evaluation of medical opinions in cases filed prior to March 27, 2017.

give any specific weight to medical opinions based on their source.[5] 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The ALJ should consider and articulate in his decision how persuasive he found all of the medical opinions of record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1520c(b), (c), 416. 920c(b), (c). However, supportability and consistency carry greater weight than the other factors, and the ALJ is only required to explain how he considered these two factors in evaluating each medical opinion. 20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2). He may, but is not required to explain how he considered the relationship between the claimant and the provider offering the opinion, the provider's specialization, and any other factors that might support or contradict the opinion.[6] 20 C.F.R. § 404.1520c(b)(2), (c), 416.920c(b)(2), (c).

---

[5] This marks a significant departure from the provisions of 20 C.F.R. § 404.1527(c)(2) and § 416.927(c)(2), whereby an ALJ was directed to give controlling weight to the opinion of a treating physician if it was well supported by medically-acceptable clinical and laboratory diagnostic techniques and was not inconsistent with the other substantial evidence of record. In addition, 20 C.F.R. § 404.1527(c)(5) and § 416.927(c)(5) provided that ALJ's should "generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a medical source who is not a specialist."

[6] This represents another significant departure from the requirements of 20 C.F.R. § 404.1527(c) and 416.927(c), whereby, if the ALJ declined to accord controlling weight to the treating physician's opinion, he was to weigh the medical opinions of record based on all of the following factors: (1) examining

In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinion . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). As for the consistency factor, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

The ALJ addressed NP Lynch's opinions as follows:

> Lastly, the undersigned considered two statements from the claimant's primary care provider, Jennifer Lynch, FNP (Exhibits 12F and 20F). The first statement is conclusory and not supported by detailed explanation. The second statement does provide greater detail concerning the claimant's MS symptoms. It appears to be inaccurate in stating that the claimant had an MS flare on May 1, 2018 (see Exhibit 19F p. 66). Regardless, the opinions given by Ms. Lynch are not consistent with the claimant's medical evidence and work history. As described above, the claimant's MS was stable at the time of her last MRIs. Her flares have occurred relatively infrequently with use of Aubagio.

Tr. at 29.

Contrary to Plaintiff's assertion, the ALJ was not required to specify the weight he accorded to NP Lynch's opinion, but was required to indicate how persuasive he considered it to be. *See* 20 C.F.R. §§ 404.1520c(b),

---

relationship; (2) treating relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that tended to support or contradict the opinion.

416.920c(b). His explanation for his consideration of the opinions indicate he considered them minimally persuasive. *See* Tr. at 29 (noting the first opinion was conclusory and not supported; the second opinion was better supported but contained an inaccuracy; and the opinions were inconsistent with the medical evidence and work history).

The record supports the ALJ's finding that NP Lynch was inaccurate in stating Plaintiff had an MS flare on May 1, 2018. *See* Tr. at 752–60. Plaintiff reported "doing great" during that visit. *See* Tr. at 755.

Although Plaintiff argues the ALJ erred in failing to specifically address NP Lynch's opinions that she would be absent from work about three days per month and would need to elevate her legs to 30 degrees for 50% of the day with prolonged sitting (ECF No. 15 at 22), it does not appear that 20 C.F.R. § 404.1520c and § 416.920c require ALJs to separately consider each limitation in a medical source's opinion. If a medical source offers more than one opinion, the ALJ is not required to consider each opinion individually, but, rather, to articulate in a single analysis how he considered the opinion from that source given the appropriate factors. 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1).[7]

---

[7] Although 20 C.F.R. § 404.1520c and § 416.920c do not require the ALJ to consider each individual opinion, the ALJ still must consider all the relevant evidence pursuant to 20 C.F.R. § 404.1545(a) and § 416.945(a) and bears the burden of resolving any material inconsistencies or ambiguities in the record pursuant to SSR 16-3p. Therefore, the ALJ should address and resolve

Plaintiff is correct that the ALJ did not explain how NP Lynch's opinions were inconsistent with the medical evidence, her part-time work history, and the frequency of her flare ups in specifically discussing his evaluation of the medical opinions. However, elsewhere in the decision and prior to discussing NP Lynch's opinion, the ALJ considered and cited evidence of infrequent MS flares, generally insignificant findings except during periods of flares, and Plaintiff's continued ability to work part-time throughout most of the relevant period.

The ALJ discussed Plaintiff's treatment with NP Lynch, acknowledging that she established treatment with NP Lynch on July 14, 2017, at which time NP Lynch observed joint tenderness, swelling, and decreased ROM, but no focal neurological deficits or impaired ability to walk. Tr. at 24. He indicated Plaintiff reported improved pain and NP Lynch increased her dose of Gabapentin and prescribed a three-pronged cane on August 4, 2017. *Id.* He acknowledged that Plaintiff reported fatigue and feared she was starting to experience an MS exacerbation when she followed up with NP Lynch for iron and Solu-Medrol infusions on August 16, 2017. *Id.* He recognized that Plaintiff reported weakness and tiredness and requested to be placed on light duty at work and to receive a steroid infusion when she returned to NP Lynch on September 26, 2017. *Id.* He discussed a follow up visit on May 1,

conflicting evidence as to the claimant's abilities and restrictions in assessing her RFC.

2018, during which Plaintiff "reported that she was doing great," "was smiling and appeared to be feeling good about herself." Tr. at 25.

The ALJ noted Plaintiff presented to NP Lynch for an iron infusion on November 7, 2018, and reported an MS flare and symptoms that included bowel and bladder incontinence, difficulty walking, fatigue, and weakness. Tr. at 26. He acknowledged that NP Lynch observed weakness and decreased reflexes on physical exam. *Id.* He recounted Plaintiff's return visits for iron infusions on November 14 and 21, 2018, at which time she reported feeling somewhat better, but demonstrated skin lesions and remained anemic. *Id.* He also discussed follow up visits for steroid infusions on December 3, 4, and 5, pointing out that Plaintiff reported "feeling much better" on December 5, 2018. *Id.*

The ALJ discussed the other evidence, noting Plaintiff had been diagnosed with MS, her most significant impairment, in March 2017 and had also received treatment for diabetes, lower back pain, foot pain, anxiety, and depression. Tr. at 27. He stated Plaintiff's most recent diagnostic assessment for MS occurred in April 2018, at which time she had no progressive demyelination or lesions. *Id.* He acknowledged that Plaintiff received treatment with Aubagio, which was "reasonably effective," and had "required steroid infusions to prevent or mitigate MS flares in August and October 2017 and November/December 2018. *Id.* He further noted Dr. Owens had

increased Plaintiff's prescriptions for Gabapentin and Baclofen. *Id.* He recognized diagnostic evidence of mild CTS. *Id.* He indicated Plaintiff "was usually able to complete PT exercises, despite the range of MS symptoms discussed herein." Tr. at 28.

The ALJ discussed Plaintiff's work history, noting she had continued to work part-time through February 2019 and had earned over $12,000 in 2018. Tr. at 27. He wrote: "Her problems with numbness, fatigue, pain, and spasm therefore did not require her to be in a chair or in bed throughout the day during that period." *Id.* He pointed out that Plaintiff had confirmed that "her issues with lower extremity numbness" had not prevented her from "driv[ing] herself to work at BiLo" and "she did not regularly require a cane before February 2019." *Id.* He stated Dr. Owens had noted Plaintiff "was still performing quite a bit of work with her hands by decorating cakes" when she complained to him of numbness in her hands and slight loss of grip strength in February 2018. *Id.*

Although the ALJ did not specifically address consistency between NP Lynch's opinions and Dr. Owens's order for home health care, he did not ignore Dr. Owens's order. The ALJ noted that on December 5, 2018, Dr. Owens "provided a referral for a home health nurse in order to help the claimant with some of her daily activities." Tr. at 26. However, the ALJ indicated that Plaintiff was experiencing an MS flare and infusion treatment

around this time, and that her "acute MS symptoms ha[d] occurred with relative infrequency." Tr. at 27. He further noted Plaintiff's ability to work part-time, drive herself to work, and work without the use of a cane through February 2019. *Id.* Thus, the ALJ cited valid reasons for declining to find consistency between Dr. Owens's order for home health care and NP Lynch's opinion.

In light of the foregoing, the ALJ complied with the provisions of 20 C.F.R. § 404.1520c and § 416.920c and cited substantial evidence to support his finding that NP Lynch's opinion was only minimally persuasive.

### 2.    RFC Assessment

Plaintiff argues the ALJ did not explain his RFC assessment in accordance with SSR 96-8p and *Thomas v. Berryhill*, 916 F.3d 307 (4th Cir. 2019). [ECF No. 15 at 25–30].

The Commissioner counters that substantial evidence supports the ALJ's RFC assessment. [ECF No. 16 at 20–23].

In assessing a claimant's RFC, the ALJ is to consider all the relevant evidence and account for all of the claimant's medically-determinable impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). This requires the ALJ to determine the claimant's ability to perform mental and physical work-related functions on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *2. The RFC assessment must include a narrative discussion

describing how all the relevant evidence supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations). *Id.* at *7. The ALJ must explain how he resolved any material inconsistencies in the record. SSR 16-3p, 2016 WL 1119029, at *7.

The Fourth Circuit explained in *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019), that "a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion. It noted that "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

The ALJ explained the RFC assessment as follows:

> Based on the foregoing, the undersigned finds that the claimant is still able to perform a reduced level of sedentary exertion. By limiting the claimant to sedentary exertion, the undersigned accommodates the claimant's MS symptoms, and also her lower back pain, foot pain, carpal tunnel syndrome, and obesity. These conditions are further accommodated by the postural and environmental restrictions specified above, which include provisions limiting the claimant's exposure to extreme heat, cold, humidity, and vibration.

> The claimant is prescribed a cane by her primary care provider, Ms. Lynch. Therefore, she must be permitted to utilize a hand-held assistive device such as a three-pronged cane as needed while standing and walking. However, she will be able with the

contralateral upper extremity to lift, carry, push, and pull up to the sedentary exertional limits. The claimant has carpal tunnel syndrome bilaterally, as well as MS-caused paresthesia. As discussed above, she worked through those symptoms on a part-time basis for a significant period of time, and her CTS is mild in nature. Thus, the undersigned concludes that the claimant can frequently engage in handling, fingering and feeling with her bilateral upper extremities, and can frequently operate bilateral hand and foot controls. Finally, the claimant will be absent from work 1 day each month on an unscheduled basis. These absences may occur because of MS symptoms including fatigue, weakness, numbness, and spasm, as well as symptoms of back pain and fatigue caused by other impairments.

Tr. at 28.

In view of the foregoing authority, the undersigned considers Plaintiff's specific allegations of error with respect to the RFC assessment and the ALJ's explanation.

a.    Completion of a Normal Workday and Workweek

Plaintiff argues the ALJ did not explain how he determined she could sustain concentration, persistence, or pace to complete full-time work. [ECF No. 15 at 27–28]. She claims the ALJ failed to resolve evidence that supported a need to elevate her legs with prolonged sitting. *Id.* at 22. She contends the ALJ did not adequately consider the effects of fatigue and MS flares that required absences in assessing her ability to complete a normal workday and workweek. *Id.* at 23, 27. She maintains that the evidence does not support the ALJ's finding that she would only miss one day of work per month, as her MS flares required multiple days of IV infusions and, even if

they were averaged over the course of a year, she would still miss more than one day of work per month for treatment. [ECF No. 15 at 23].

The Commissioner argues that Plaintiff had only mild limitation in concentrating, persisting, or maintaining pace. [ECF No. 16 at 20]. He claims the ALJ addressed examples of impaired concentration, persistence, or pace and noted specific evidence that supported only a mild limitation. *Id.* He contends the ALJ accommodated Plaintiff's fatigue by including a provision in the RFC assessment for her to be absent from work on one day per month on an unscheduled basis. *Id.* at 21. He notes the ALJ appropriately considered Plaintiff's part-time work in accordance with 20 C.F.R. § 404.1571 and § 416.971. *Id.*

As Plaintiff challenges the ALJ's conclusion as to her degree of impairment in concentrating, persisting, or maintaining pace, the undersigned has considered only that area of mental functioning. The ALJ should "rate the degree of [the claimant's] functional limitation based on the extent to which [her] impairments interfere with [her] ability to function independently, appropriately, effectively, and on a sustained basis," which may require evaluation of "the quality and level of [her] overall functional performance, any episodic limitations, the amount of supervision or assistance [she] require[s], and the settings in which [she is] able to

function." 20 C.F.R. § 404.1520a(c)(2). Pursuant to 20 C.F.R. Pt. 404, Subpt.

P, App'x 1 § 12.00(E)(3), concentrating, persisting, or maintaining pace:

> [R]efers to the ability to focus attention on work activities and
> stay on task at a sustained rate. Examples include: Initiating and
> performing a task that you understand and know how to do;
> working at an appropriate and consistent pace; completing tasks
> in a timely manner; ignoring or avoiding distractions while
> working; changing activities or work settings without being
> disruptive; working close to or with others without interrupting
> or distracting them; sustaining an ordinary routine and regular
> attendance at work; and working a full day without needing more
> than the allotted number and length of rest periods during the
> day.

A mild degree of limitation is consistent with only slightly limited ability to

function independently, appropriately, effectively, and on a sustained basis.

20 C.F.R. Pt. 404, Subpt. P, App'x 1 §12.00(F)(2)(b).

The ALJ assessed mild limitation in concentrating, persisting, or

maintaining pace. Tr. at 19. He acknowledged Plaintiff's reported "problems

with concentration during primary care," that she "appeared easily distracted

at the intake assessment for mental health services," and that she had

"problems with fatigue secondary to MS and other conditions." *Id.*

Nevertheless, he concluded there was "no evidence that depressive symptoms

[were] the primary cause of fatigue in the claimant's case." *Id.* He wrote:

> She testified that she spent time watching TV during the day,
> suggesting that she is able to follow the course of a show, energy
> permitting. She was able to work on a part-time basis through
> February 2019, indicating that she retained the ability to persist
> and maintain pace. She did not appear to have problems with
> focus or concentration during the hearing.

*Id.*

Although Plaintiff couches her argument as an allegation of error as to the ALJ's assessment of a mild degree of impairment in concentrating, persisting, or maintaining pace, she does not make a cogent argument that her mental impairments would restrict her to more than a mild degree. Given the ALJ's explanation, the undersigned finds he appropriately assessed a mild degree of impairment in concentrating, persisting, or maintaining pace under the special technique for evaluating mental impairments in 20 C.F.R. § 404.1520a and § 416.920a. Nevertheless, as the ALJ acknowledged, the record contained evidence to suggest Plaintiff's abilities to concentrate, persist, and maintain pace were affected beyond the degree her mental impairments imposed. *See* Tr. at 19. Thus, the ALJ was required to further consider these abilities in assessing Plaintiff's RFC.

A review of the RFC assessment shows the only provision to address impairment to concentration, persistence, or pace was for one unscheduled absence per month "because of MS symptoms including fatigue." *See* Tr. at 21, 28. The ALJ rejected allegations of daily fatigue as inconsistent with Plaintiff's ability "to continue working part-time through February 2019." Tr. at 27.

It was appropriate for the ALJ to consider Plaintiff's part-time work activity in assessing her RFC. Pursuant to the regulations, "[t]he work . . .

54

that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level" and "[e]ven if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did." 20 C.F.R. §§ 404.1571. 416.971. Although the ALJ found the work Plaintiff performed during the relevant period was not SGA, he also noted that she "did closely approach SGA-level work activity at times after October 1, 2017," as she "earned approximately $1,085 per month during the 3rd quarter of 2018, and $12,100 overall for 2018 (Exhibits 9D and 10D)." Tr. at 17–18. In 2018, the monthly SGA amount for non-blind individuals was $1,180. *See Substantial Gainful Activity*, Social Security Administration (December 29, 2020) (available from: https://www.ssa.gov/oact/cola/sga.html). Thus, the ALJ recognized that Plaintiff's earnings were close to an amount that would have disqualified her for benefits. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b) (providing that "[i]f you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled regardless of your medical condition or your age, education, and work experience"). In addition, the ALJ explicitly stated that Plaintiff's "problems with numbness, fatigue, pain and spasm therefore did not require her to be in a chair or in bed throughout the day during that period," as she was able to engage in part-time work activity. Tr. at 27.

Plaintiff argues the ALJ's reliance on her part-time work history was not sufficient to refute evidence that she would need to elevate her legs while sitting, as her part-time work did not involve prolonged sitting for more than 50% of the workday. [ECF No. 15 at 22]. The ALJ did not specifically consider whether Plaintiff needed to elevate her legs while sitting, but instead considered her general allegation that she needed to elevate her legs throughout the day. He found this allegation to be inconsistent with the fact that she was not elevating her legs throughout the day during the time she was working. The only other indication in the record that Plaintiff would require elevation of her legs was NP Lynch's one-time opinion. Although NP Lynch noted joint swelling during multiple visits, she did not specify the area of swelling or include instructions for Plaintiff to elevate her legs. *See* Tr. at 688–90, 695–97, 703–09, 723–25, 734–37, 740–43, 747–50, 755–60, 768–72, 775–78, 979–81, 984–89, 1028–32. As discussed above, substantial evidence supports the ALJ's finding that NP Lynch's opinion was not persuasive. In the absence of additional evidence to support such a restriction in the record, the ALJ did not err in declining to include a provision for Plaintiff to elevate her legs while sitting in the RFC assessment.

The undersigned has considered Plaintiff's argument as to the frequency of anticipated absences and finds the ALJ reasonably concluded

that she would be absent from work on an unscheduled basis on one day per month.

Although Plaintiff argues her absences during periods of MS flares would exceed one-day per month, even if averaged over the relevant period, the record does not fully support her argument or refute the ALJ's finding as to the frequency of absences. The ALJ's finding that Plaintiff only experienced MS flares in August 2017, October 2017, and November 2018 is consistent with the record. *See* Tr. at 27. Only two of Plaintiff's MS flares occurred over the relevant period, as Plaintiff amended her alleged onset date to October 1, 2017. *See* Tr. at 48. While Plaintiff experienced a flare that required intravenous steroid infusions on October 2, 3, 4, and 6 and led to an ER visit on October 7, 2018, more than a year passed before she experienced another MS flare requiring steroid infusions. *See* Tr. at 571–75, 688–90, 734–37, 740–43, 747–50, 984–89, 990–95. Plaintiff received iron infusions on November 7, 14, and 21, 2018 and December 14, 2018 and steroid infusions on December 3, 4, and 5, 2018. Tr. at 979–81. 984–89, 990–95, 1005, 1012–15, 1020–23. However, it is not clear from the record whether the MS flares and receipt of infusion treatment prevented Plaintiff from working on these days.

The ALJ considered Plaintiff's ability to maintain a part-time job over the relevant period, earning near-SGA amounts from October 2017 through February 2019, which suggested that even though she experienced two MS

flares over this period, she was not absent from work often enough for her to be terminated. *See* Tr. at 27. Given the period of over a year between Plaintiff's MS flares and the absence of evidence that Plaintiff was precluded from working during the flares, it was not unreasonable for the ALJ to conclude that Plaintiff's impairments and treatment would cause her to be absent from work, on average, once a month on an unscheduled basis.

In light of the foregoing, the undersigned finds the ALJ adequately considered and reasonably resolved conflicting evidence as to Plaintiff's ability to complete a normal workday and workweek in assessing her RFC.

### b.     Potential Conflict in RFC Assessment

Plaintiff argues the ALJ did not reconcile his finding that she could perform sedentary work requiring frequent bilateral handling, fingering, and feeling with his findings that she needed to use a cane while standing and walking for one-third of the day. [ECF No. 15 at 28–30]. She maintains that "to maintain balance while standing, the individual would need to place one hand on the cane" and "[t]his would only allow the individual to perform manual tasks with one hand and is inconsistent with performance of any job that requires use of the bilateral hands for up to two-thirds of the workday." *Id.* at 28. She claims that if she were to use at least one hand while standing and walking for up to two-thirds of the workday, "she would only be able to

use her hands for an additional one-third of the day as she had already used her hands for walking and standing for two hours." *Id.* at 30.

The Commissioner maintains the job of call-out operator could be performed even if Plaintiff were required to hold her cane while standing and walking for up to a third of the workday because it requires only occasional handling and fingering and no feeling. [ECF No. 16 at 22]. He further argues that the jobs that required frequent handling, fingering, and feeling did not require that those functions be performed bilaterally on a frequent basis. *Id.* at 23.

> Sedentary work is explained as follows:
>
> The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday.

SSR 96-9p, 1996 WL 374185 at *3.

Plaintiff's argument fails for several reasons. First, although sedentary work requires occasional standing and walking, occasional might be "very little," pursuant to SSR 96-9p. Plaintiff's argument assumes she would be engaging in the maximum amount of standing and walking for a job to be

considered sedentary, but she identifies no evidence that would support such a finding.

Second, although the ALJ permitted Plaintiff "to utilize a hand-held assistive device such as a three-pronged cane as needed while standing and walking, with the contralateral upper extremity able to lift, carry, push, and pull up to the sedentary exertional limits," he did not specify that Plaintiff would always be using her bilateral hands while standing and walking. The ALJ acknowledged that Plaintiff might not require use of a cane for all standing and walking, but could do so "as needed." Given Plaintiff's admission that she did not use a cane for standing and ambulating in her home, Tr. at 75, it logically follows that she might not require a cane for all standing and walking in the workplace. The ALJ similarly provided that Plaintiff would be "able to" use her other hand to lift, carry, push, and pull, but the recognition of such an ability does not necessarily mean Plaintiff would be expected to use her bilateral extremities every time she stood or walked with a cane.

Third, even if Plaintiff used her bilateral hands throughout the time she was standing and walking with the use of a cane and even if she did so for up to one-third of the workday, she has failed to show that only being able to use her bilateral hands for handling, fingering, or feeling during half the

period she would be seated would preclude her from performing the identified jobs.

Fourth, the ALJ did not merely conclude that the restrictions in the RFC assessment would permit Plaintiff to perform jobs that exist in significant numbers, he obtained VE testimony and relied on specific jobs the VE identified as being consistent with the assessed RFC. *See* SSR 96-9p, 1996 WL 374185 at *7 (explaining that in situations where an individual is restricted to unskilled, sedentary work and requires a hand-held assistive device "it may be especially useful to consult a vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work").

Finally, as the Commissioner points out, the *DOT* describes the job of call-out operator as requiring occasional handling and fingering and indicates feeling is "not present." 237.367-014, CALL-OUT OPERATOR. *DOT* (4th Ed., revised 1991), 1991 WL 672186. Therefore, even if Plaintiff were required to use her bilateral upper extremities for up to a third of the workday to stand and walk with her cane, she could still use her bilateral hands to meet the occasional handling and fingering requirements of the job without exceeding the frequent handling, fingering, and feeling provisions in the RFC assessment.

In light the foregoing, the undersigned finds no conflict between the provisions in the RFC assessment for sedentary work, use of a cane, and frequent bilateral handling, fingering, and feeling. Therefore, substantial evidence supports the ALJ's RFC assessment.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

January 5, 2021                    Shiva V. Hodges
Columbia, South Carolina          United States Magistrate Judge